(No. 17131.—Judgment reversed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ODDIE FRIEDMAN *et al.* Plaintiffs in Error.

*Opinion filed June 16, 1926.*

1. BROKERS—*specific terms of contract with a broker are controlling over usage or custom.* Where sales of stocks are made by a broker to a customer, either upon margins or upon the partial payment plan, and the contract of sale is specific in its terms, such specific terms are controlling over any usage or custom.

2. CRIMINAL LAW—*what is necessary to convict brokers of embezzling funds received of agent of corporation.* Under an indictment charging brokers with embezzling funds received of the agent of a corporation for investment purposes, it is not sufficient merely to prove that the defendants received, as brokers, from the agent funds belonging to either the agent or the corporation and that upon demand they failed to pay the same over, but an unlawful and felonious intent to embezzle the moneys of the corporation must be established against them beyond a reasonable doubt.

3. SAME—*when brokers are not proved guilty of embezzling funds received for the purchase of stock.* Brokers are not proved guilty of embezzling funds received of an agent of a corporation for the purchase of stock on the installment plan where the evidence fails to show an unlawful and felonious intent to embezzle or fraudulently convert to their own use the money of the corporation; and their refusal to deliver or sell the stock upon demand is not a fraudulent conversion, where they were not required to do so by the specific terms of their contract with the agent until payment of the final installment.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE FRED RUSH, Judge, presiding.

JOHN F. TYRRELL, ARTHUR KETTLES, BENEDICT J. SHORT, and BERNHARDT FRANK, (THOMAS E. SWANSON, and ELWYN E. LONG, of counsel,) for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (HENRY T. CHACE, JR., EDWARD E. WILSON, and CLARENCE E. NELSON, of counsel,) for the People.

·Mr. JUSTICE HEARD delivered the opinion of the court:

This case is in this court on writ of error to review a judgment of the criminal court of Cook county by which plaintiffs in error, Oddie Friedman and Mark A. Friedman, were sentenced to the penitentiary for the crime of embezzlement of the sum of $3050, the property of the Accurate Devices Manufacturing Company, Inc., a corporation, which had come into their possession by virtue of their employment as agents and brokers of the Accurate Devices Manufacturing Company.

It is contended by plaintiffs in error that the evidence in the case does not show that they, or either of them, were guilty of embezzling any of the moneys of the corporation. Many of the facts are undisputed. During the years 1923 and 1924 plaintiffs in error, together with Samuel B. Friedman, were engaged in business in the city of Chicago as stock brokers under the name of Freeman & Co., a corporation. At that time there was a corporation doing business in that city by the name of Accurate Devices Manufacturing Company, Inc. Carl F. Mueller was secretary and treasurer of that company. During November, 1923, Mueller became a client of plaintiffs in error and gave them orders from time to time for the purchase of stock, and drew checks on the funds of the corporation, as such secretary and treasurer, to pay in the margins required by plaintiffs in error. In Mueller's business with plaintiffs in error, stocks previously purchased for him were in each instance sold before others were purchased. It appears that Mueller bought 50 shares of Hup Motor stock, giving for the margin thereon the checks of the Accurate Devices Manufacturing Company. This stock was later sold and Southern Oil stock was purchased. It appears that the Hup Motor stock was sold at a profit and the profit credited to Mueller's account. When the Southern Oil stock was purchased, Mueller, as in previous cases, gave the check of the corporation, with his credit on account, to cover the margin required of

him by plaintiffs in error. The Southern Oil stock was sold out at a profit, and such profit, together with the margins originally paid in and further checks of this corporation, was applied to the purchase of 5000 shares of stock called "New Dominion A." These 5000 shares of stock were not purchased upon margin but on the installment plan, 3000 December 21, 1923, and 2000 December 27, 1923. These contracts of purchase were witnessed by written memoranda, the one of December 21, 1923, being as follows:

"We have contracted to sell and will deliver to you

| | | | | | | Payments | |
| Shares | Description | Price | Amt | Service | Cash | Date | Amount |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 3000 | New Dominion "A" | 2½ | 7500 | 120.00 | 3239.20 | Dec 27 | 300.00 |
| | | | | | | Feb 13 | 580.00 |
| | | | | | | May 13 | 1000.80 |
| | | | | | | Jun 13 | 2500.00 |

Providing, however, you make the above payments with the distinct understanding that the title to and ownership of these securities shall not pass to you nor shall the certificate therefor be issued nor delivered to you until payment as described above shall have been made, and that stock will in no event be delivered or sold until final payment date as stated above, and that all securities carried in this account or deposited to secure the same, or to secure the unpaid balances on same, may be carried in our general loans and may be sold or bought at public or private sale, without notice, when such sale is deemed necessary by us for our protection, and that this account, in whole or in part, is not transferable, assignable or negotiable until actual delivery has been made, and that the terms of sale appearing on the face hereof constitute the complete and only contract between us, and that in the default of any payment described above we reserve the right to dispose of your account at our option. These are the only conditions

upon which we accept and carry this account, and if you do not notify us to the contrary, in writing, within five days from the date first set forth, we shall understand that same are acceptable to you and you consent thereto."

The terms and conditions of the sale of December 27, 1923, were the same as those of December 21, 1923, except that the payments were to be March 13, $1000, April 13, $1000, July 13, $1080, service $80 and cash $2000.

The evidence shows that where stocks are sold by a broker to a customer upon margin, in the absence of a specific contract to the contrary, under the rules and customs relating to broker and customer, the broker agrees, first, to at once buy for the customer the stock indicated; second, to advance all moneys required for the purchase beyond the margin furnished by the customer; third, to carry or hold such stock for the benefit of the customer as long as the margin is kept good or until notice is given by either party that the transaction must be closed; fourth, to keep at all times in his name and under his control, ready for delivery, the shares purchased or an equal amount of other shares of the same stock; fifth, to deliver such shares to the customer when required by him, upon receipt of the advances and commissions accruing to the broker; or, sixth, to sell such shares upon the order of the customer upon payment of his interest and commissions and to account to the customer for the proceeds of the sale. Under such contract the customer is, first, to pay the margin required, second, to keep such margin good according to fluctuations of the market, and third, to take the shares purchased by the broker on his order whenever required by the latter to do so and to pay the difference between the percentage advanced and the amount paid therefor by the broker. The broker need not necessarily carry the stock in his own custody but it must be under his control. He can hypothecate the stock as his business may require. Where stock was sold by a broker upon the installment plan there was a cus-

tom, usage or rule of trading which required the broker to have the stock ready for delivery upon the payment of the debit balance, and upon payment of such balance he must deliver the stock to the customer or sell it at any time prior to final payment upon a sale order by the customer. Ordinarily banks do not loan on stocks selling below $10, so that it was the custom among brokers, when making a sale to a customer upon the partial payment plan, to immediately purchase the stocks from another broker upon the partial payment plan, such stocks to be held by the second broker until the first broker complied with the terms of purchase. Where, however, sales of stocks are made by a broker to a customer, either upon margin or upon the partial payment plan, and the contract of sale is specific in its terms, such specific terms are controlling over any usage or custom. In accordance with the custom, upon receiving the order from Mueller for 3000 shares of New Dominion class "A" stock, Freeman & Co. purchased from a New York brokerage firm 3000 shares of that stock upon the partial payment plan to cover the contract with Mueller, and upon receiving the order for the 2000 shares it purchased a like number of shares from the same firm upon the same plan according to custom and usage, the stocks to remain with the New York firm until payment of the final installment. The contracts between Mueller and Freeman & Co., and between Freeman & Co. and the New York firm, were both specific in their terms, and Mueller was not entitled to receive the stock from Freeman & Co. before final payment therefor, and Freeman & Co. was not entitled to receive the stocks from the New York firm until final payment therefor. By the specific terms of the contracts Freeman & Co. could not compel the New York firm to sell the stocks for it prior to final payment, and by the specific terms of the contract between Mueller and Freeman & Co. Mueller had no right to require Freeman & Co. to sell the stock for him prior to his final payment therefor.

In all these contracts the rights of the parties were governed by the specific terms of the contracts and not by usage or custom in conflict with such specific terms.

On January 3, 1924, one Leonard, who was a stockholder and manager of the Accurate Devices Manufacturing Company, learned of the transaction between Mueller and Freeman & Co. and on that day had a conversation with Mueller, in which he said: "We will not go further with it; we will close it out; and give me a list of every check you paid into that company and what we bought." On January 4, 1924, Leonard went to the office of Freeman & Co. and had a conversation with plaintiff in error Oddie Friedman. The evidence as to what was said at this conversation is somewhat conflicting. Leonard says that he told Friedman: "Carl Mueller, our secretary and treasurer, is using our money in this company unbeknown to us, and we want to close it out. I don't know anything about your transactions, but we have got to get out from under. We don't want it;" that Friedman said: "These stocks are handled through New York, or some such thing as that. I cannot do much until after two o'clock,—after the market is over,—when we will talk it over on our private wire. If you will come back to-morrow I will let you know what is said;" that he went back the next day; that Friedman said: "We cannnot do anything on that now, but you don't need to keep up the payments for a while if you are short; let it go for a while;" that Leonard said, "I want to close it now." Leonard testified as to another conversation with Friedman: "I told him how Mueller was selling or throwing away all the profit he had made; if he would just give back the company's money he had put in it would be all right, and we would be willing to accept it and let the profits go and put the money back where it belonged, but that Friedman said, 'We cannot do it.' " Other meetings took place between the parties, which finally culminated in the arrest of the plaintiffs in error upon the

321–37

charge of embezzlement. Friedman gives a different version of these conversations, but the difference is not material in this case.

It is contended by defendant in error that a stock broker buying stocks for an officer of a corporation for the personal account of such officer, by receiving funds of the corporation for the payment of such stock becomes a trustee of such funds for the use of the corporation and is accountable to the corporation for such funds. The rule in that respect is laid down in *Leigh* v. *American Brake-Beam Co.* 205 Ill. 147, where it was held that one who deals with an officer of a corporation knowing that the officer is assuming to act for it in a matter wherein his interests and those of the corporation are adverse is bound to inquire into the officer's authority, and that one who receives from a corporation, under an *ultra vires* contract, money which in equity and good conscience belongs to the corporation is liable in an action by the corporation for money had and received if the contract is not *malum in se* or *malum prohibitum.* Whether or not Freeman & Co. would be liable to the Accurate Devices Manufacturing Company in a civil suit is immaterial in this case. This is not a civil suit but plaintiffs in error are charged with a criminal offense which "consists in a violation of a public law, in the commission of which there shall be a union or joint operation of act and intention, or criminal negligence." (Smith's Stat. 1925, par. 588, p. 946.) Under the indictment in this case, to warrant a conviction of plaintiffs in error for embezzlement it is not sufficient merely to prove that they received, as brokers, from Mueller, funds belonging to either Mueller or to the Accurate Devices Manufacturing Company and that upon demand they failed to pay the same over, but an unlawful and felonious intent to embezzle the moneys of the Accurate Devices Manufacturing Company must be established against plaintiffs in error beyond a reasonable doubt before they can be convicted of the crime of embez-

zlement. (*People* v. *Paddock,* 300 Ill. 590.) The articles of incorporation of the Accurate Devices Manufacturing Company were not introduced in evidence, and it does not appear whether the act of Mueller, as secretary and treasurer of the corporation, in entering into the contracts in question were *ultra vires* the corporation or whether he had a right to make the contracts on behalf of the corporation. He testified that he thought he had such right. While the payments made by Mueller to Freeman & Co. were made by the checks of the corporation, it does not appear from the evidence that either plaintiff in error ever saw such checks or knew that the stocks were paid for by such checks. The evidence shows S. B. Friedman was book-keeper for the firm and received all checks that came in and deposited them for collection. Oddie Friedman testified that he never heard of the Accurate Devices Manufacturing Company until he met Leonard and that he never saw a check of the company until after the case was started. Plaintiffs in error did not fraudulently convert the proceeds of these checks to their own use when they received such proceeds, but invested them, according to the custom among brokers, in stocks upon the partial payment plan, and they at all times were able, ready and willing to carry out the specific terms of the contract which they had entered into with Mueller. By the specific terms of that contract they were not required to deliver or sell the stocks before payment of the final installment. Their refusal to do so, therefore, was not either a fraudulent conversion of the stocks or of the funds received for their purchase. *Sackville* v. *Wimer,* 76 Colo. 519.

The evidence in this case entirely fails to show upon the part of plaintiffs in error an unlawful and felonious intent to embezzle or fraudulently convert to their own use the moneys of the Accurate Devices Manufacturing Company, and the judgment of the criminal court must therefore be reversed.                                    *Judgment reversed.*